It is an honor and pleasure for me to have Katina Parker. This is a Social Security Disability case that asks a very simple question. Where the examining physician articulates specific discreet limitations, and the ALJ doesn't explain the weight given to those discreet limitations. Can the ALJ depart from those limitations that are material and significant to the ability to perform work? And the answer to that question is no. Under the regulations, in effect at the time of the ALJ decision, the ALJ must explain the weight given to all medical evidence. And in the district court, in here, Parker argues that Dr. Bilbray found that she had a marked limitation in interacting with others, that she had significant limitations in maintaining persistence and pace, and that she was limited to one-step instructions. None of those limitations found their way in the ALJ decision, and the ALJ didn't explain why those limitations didn't. And the case law that predates the regulations that were in effect at the time of the ALJ decision, the flaw in the ALJ must articulate specific and legitimate reasons for rejecting those opinions, when those opinions are contradicted by substantial evidence in the record. Concededly, Dr. Billig, the state agency physician, and Dr. Garcia, by just frank affirmation, stated that Parker could perform several repetitive tasks, that she was tagged for social interaction, that she could benefit from close public contact, but neither Dr. Billig or Dr. Garcia favored the record with an explanation of why they disagreed with the examining physician. And the examining physician, by regulation, is the favored source for medical opinion evidence. The commissioner states that she will always give more weight to the opinion of an examining physician than to a non-examining physician as a matter of regulatory fiat, which places the burden on the ALJ and her lesser and other cases to give good reasons for rejecting the opinions of Dr. Bilbray. In this report, Parker submitted the host of limitations described by Dr. Bilbray as an elephant, and in the brief to this part, we've talked of the elephant in twice as pieces. The commissioner argues that the arguments in pieces are weighed, and that's just not true. The district court clearly understood what the gist of Parker's arguments, and understood what Parker said when Janet and the district court stated that the ALJ was under no obligation to reject the pieces of the limitations described by Dr. Bilbray. And the district court was just made a mistake. The district court erred in that respect. And so we have this under Lewis and other cases. The ALJ always has to produce probative evidence, and clearly the opinions of Dr. Bilbray are probative evidence of significant limitations. With respect to the mark limitation in interacting with others, the ALJ didn't construe the word others to mean public. Dr. Cohen and Dr. Garcia did not construe the word others to mean public. And the common understanding of the expression of the mark limitation in interacting with others would include co-workers and supervisors. And we understand that allowing unfettered contact with co-workers and supervisors is different than the limitation of no public contact. Mark limitations in interacting with co-workers and supervisors is critical to performing unskilled work. And the ALJ didn't explain how he got from the data to the conclusion, and therefore erred. The next limitation is the limitation to one-part instructions. In one-part instructions, after the district court case was briefed and before this case was fully briefed, this court issued two important decisions in the following rounds that changed the landscape of how we address this question of school board connectivity. The one-part instructions was not a centerpiece or an assertion not properly argued before the district court, but I think that the change in law and framework in the following rounds permits this court the discretion to address that pure question of law. One-part instructions is certainly inconsistent with the ability to perform reasoning level three work under subalignment grounds. The last limitation is the limitation in performing consistently on a regular basis. And as a matter of law, Parker has demonstrated that in performing at a consistent pace, as the commissioners have experienced published in POMS, which is a substantial form of guidance to the agency and to this court in understanding the commissioners' complicated regulations, not only is the ability to perform at a consistent pace critical to performing on school board, but it's also strictly enforced in counsel. If we were to accept your arguments, why wouldn't we remand back to the NALC and consider the limitations identified by the consultant and physician? That's exactly what we asked for in this case. If that's an area that asks you for a reward or benefits, you want to remand back to NALC. Unlike the case in Target, previously the counsel had argued on behalf of Parker at the administrative hearing, although the pre-hearing briefs discussed these limitations, did not frame that specific question to the vocational experts as a proper remedy. In this case, on the incomplete record, it's to remand for further proceedings to ask the questions framed by Dr. Bilbray. Was the vocational expert asked questions under the assumptions the LJ made when he discounted some of the training physician testimony? So was there a vocational expert in this case? There was. Okay. Was he asked hypothetical based on evidence of discounting the training physician testimony? The examining physician, yes. The examining physician? Dr. Bilbray's the examining physician. All right. So you want to go back and ask the hypothetical crediting some of the other testimony, and that just wasn't done in this case? That's correct. Okay. That's correct. Thank you, counsel. Thank you. May it please the Court, Henry G. for the Commission on Social Security. The ALJ's RFC here was for simple repetitive tasks with no public interaction. He said in his decision that that was supported by the consultative examiners as well as the state A&C physicians. And the thing in here is really raising three things that he's alleging that the consultative examiner, Dr. Bilbray, said that the ALJ did not include in his RFC finding, and that is the no interaction with others, the limitation of one-part instructions, and the moderate limitations in peace. And I like to focus first on the no limitations with others because I think the other two aspects are actually incorporated in the ALJ's RFC finding. With regards to the no interaction with others, I do admit that at first glance it really does appear in conflict with the ALJ's finding that there's no public interaction. And I do admit that the ALJ did not articulate why he didn't agree with that in the decision. He did not specifically articulate why. And what I'm relying on is the fact that the ALJ looked at the entire medical record. And as you look through the ALJ, you see that he summarizes numerous pieces of medical evidence. And the fact of the matter is, in order to find that the limitation of others includes a preclusion from interacting with coworkers and supervisors, that interpretation of others really has to include excellency to everyone in your life. And that to me is a kind of the meaning of the word others. And the pretext, I think, is something he talks about, as evidenced by your interaction with the examiner and client personnel. So they're the functional equivalent of coworkers, I think. I just think you're talking about people around you, not the public. So how do you come to your conclusion that others means the public and not coworkers? So I understand your point of view, but I would respectfully disagree with that characterization. So here it is correct, you know, that Dr. Bilbrey's opinion of limiting others is qualified. She says it's evidenced by her interactions with the consultative examiner and presumably the clinic personnel. But I would argue that the consultative examiner and these clinic personnel, this is one time consultative examiner. She has not met this doctor before. She does not have an ongoing relationship with this doctor. So in some sense, this interaction with the doctor, I would argue, is more akin to a stranger. I would argue that to see how she interacts with you, a lot of times there's a conclusion here. A lot of times she's new people. This is the conclusion. She would have marked difficulty interacting adequately with others. And it goes on to say she can avoid simple hazards. She can only keep all of one part instructions. And then at the end of this, this is the claim of could not be considered capable of handling funds. I mean, those are pretty significant limitations. No, I agree. Really focusing on the others. You know, talking about the other ones, I do think those other ones were included in the ALJ's RFC finding. But with respect to the others, I think, you know, based on our discussion here, we're having difficulty interpreting exactly what Dr. Bilbrey meant when he said others. It looks like you suggested that others meant strangers, which is why you would be working with family and friends when you should be working with strangers. So when she's 30, so we know that the ALJ's RFC already concludes her interaction with the public. So we're left with co-workers and supervisors. And, yes, so she's going to be working with someone with these unskilled jobs. It's really hard to picture a job where you don't have the answer to a supervisor. And I suspect those unskilled jobs have a high turnover rate. There would be different co-workers flowing through, different managers. Wouldn't they be strangers? Yeah. And that's outside of my relevant expertise, so that would be something for a vocational expert to answer. But playing to the record, you know, the record shows that she can interact with numerous senior physicians and numerous other medical professionals. The record shows that she's cooperative and she maintains good eye contact. She has a quite extensive set of daily activities that includes interacting with her son, her parents, taking her son to school. The record also reflects that she's able to have a boyfriend, though apparently I think they broke up at some point. I can't tell from the record, but she's able to establish relationships. I think really, you know, an interesting medical record would be that of Dr. Middleton. It's a May 2009 finding, and that's end of ministry record 319. In that finding, Dr. Middleton notes that the patient has slight to moderate problems with what appears to be interpersonal relationships. And he notes that the reason she has that problem is because she has poor social skills, but he does not indicate that she has any difficulty establishing or maintaining relationships or any problems with relationships at work. So to me, that opinion reflects ALJ's finding that she can't necessarily interact with the public, but that she can, you know, interact with co-workers and supervisors. And another indication of that is the ALJ actually relied on state agency physicians and pickets here. And counsel said that the state agency physicians, if I believe I heard correctly, didn't explain why they agreed with the consultative examiner, Dr. Bilbrey, but that's not correct. State agency physician Dr. Billick actually considered the entire record, and unlike Dr. Bilbrey who based his finding on just that one interaction, state agency physician Dr. Billick looked at the entire record. And with respect to consultative examiner Dr. Bilbrey's opinion, he gave that finding limited weight. He noted that Dr. Bilbrey indicated in his test results that his results were unexpected and appeared in her history of higher functioning. And he also cited consultative examiner Dr. Suclars' finding where Dr. Suclars actually noted that the claimant's mental status was poor, even trying to please a person. Her outfit was normal, her response was more appropriate, her memory was grossly normal. So the claimant didn't have the same difficulties with consultative examiner Dr. Suclars as she did with Dr. Bilbrey. And then Dr. Billick relied on his findings based on the overall evidence and the overall senior records to show that she can interact with co-workers and supervisors. So she's not precluded from interacting with no wider universe of individuals than what the ALJ's RFC finding was. Now, if there's no questions about that, I really do want to focus on the other two things that the claimant is arguing here, that the ALJ's RFC didn't adopt. The claimant focuses on Dr. Bilbrey's opinions for one-part instructions. And the issue with that isn't entirely the entire scope of Dr. Bilbrey's opinion. Dr. Bilbrey actually found that the claimant can do one-part instructions, and she can handle simple tasks, and she can perform two-part instructions going to the moderate difficulty. So Dr. Bilbrey actually found that the claimant can perform simple tasks. That is the most that she can do despite her impairments. And the ALJ found simple and repetitive tasks. With respect, Dr. Bilbrey's opinion on that front is consistent with the ALJ's RFC finding. The next issue is these moderate case limitations. And if you read Dr. Bilbrey's opinion, there are moderate limitations in concentration, persistence of pace, and other moderate limitations. And I would argue that here Stubbs nails, and really, as we guide this court in the analysis here, is Stubbs nails, and this court held that the ALJ does not necessarily have to articulate these moderate limitations. If you realize that a state AAC physician then found that despite those limitations, the claimant could still do simple, repetitive tasks. And that's exactly what happened here. Dr. Bilbrey looked at the claimant's condition, and he actually found at AR 373 through 374, there's a checklist, a checklist where he makes the analysis. And that's the substance of his opinion is with the checklist. So that was criticized in the last case. So this checklist is different? It's a little different. If I receive an opinion, I understand the agency's position. You reject some evidence based on your standpoint. In this case, that's what we found. You're relying on it. So if I may just recall from the last argument, when I was in monitoring, apparently that seems to be a checklist that was given to a shrinking physician that presumably was impaired by an attorney. Why are you saying it was impaired by an attorney? It was prepared by the nurse practitioner. I'm sorry? The checklist in the last case was prepared by the nurse practitioner. It was not prepared by an attorney. Oh, I'm sorry. But I think the point I was trying to make was that that was not an agency form that the state agency physicians are using. So it's okay if the state agency uses the checklist, but not if it's outside of treating physicians? It depends on the person who wrote the checklist that you're saying. So I do agree with you, and it does depend on who prepares the checklist. And here the reason lies here. I mean, if this is the same thing, who would care so prepare it? To hear that the reason why I think it matters who prepared it is that it's the agency physician here that's preparing it and performing this analysis. This is something that's in the realm of the state agency physician's expertise. This is something you fill in just to secure your rulings. This is the state agency physician's job. They work with these checklists. This part of the checklist is about the residual functional capacity finding. This part is where the state agency physician is looking at the severity of the impairments. And later, as you go through the checklist, you'll see residual functional capacity finding. And that's where the state agency physician uses his expertise to translate that into the residual functional capacity finding, which is consistent with the ALJ's RFC. I see that. I'm going to tell him. And I respectfully request that you affirm the commissioner's decision. Thank you. Thank you, counsel. Just wanted to clarify two factual points to avoid confusion. One, it was Dr. Bilbray that administered the waste intelligence testing. And it was Dr. Bilbray that said he was surprised by the global results. So Dr. Bilbray actually assumed the proper factual predictive for expressing his opinions. That's not a basis for rejecting his opinion. And the state agency workup in page 372 of the administrative record, Volume 3 of the excerpts, is a workup by the disability evaluation analyst and expresses no criticism whatsoever of Dr. Bilbray's opinion in the mental residual functional capacity assessment. By Dr. Billick, in the next three pages, expresses no criticism of Dr. Bilbray's opinion. Counsel, with regards to Dr. Bilbray's surprise about the results, did he assess any potential lingering? He did not. He did not express a lingering at all. He assessed that. In some of these tests, you have a way of calculating whether a person taking an exam or going to an exam is evidencing a lingering. The doctors are trained. I think we can take notice of the fact that doctors are trained to assess a lingering on psychological testing. And doctors know how to use that word. They're not afraid of the word lingering. The fact that Dr. Bilbray didn't use the word lingering tells me that he thought her presentation was genuine. And I think he characterized her as a theory historian, which means he didn't, and she was, she's got a memory problem, so she's not malingering. But there's no allegation of a lingering in this argument. Not even one. If there's no further questions, I'll hold my last 55 seconds. Thank you. Thank you. This is very good piece of information. Thank you both for being our guests this morning. And we'll be proceeding to the argument in the case of Treviso v. Trayhill.
judges: Thomas, Wardlaw, Morris